In the Matter of the application of the VILLAGE OF WALTHILL, Nebraska, and the Chairman and Village Board of said Village for the appointment of Judges to constitute a Court of Condemnation.

VILLAGE OF WALTHILL, Nebraska, a municipal corporation, Plaintiff,

v.

IOWA ELECTRIC LIGHT AND POWER COMPANY, a corporation, Central States Electric Company, a corporation, First National Bank of Chicago (Trustee), a corporation, and Harold Eckhart (Trustee), Defendants.

Civ. No. 77.

United States District Court, D. Nebraska, Omaha Division.

Nov. 29, 1954.

Perry & Perry, R. R. Perry and W. W. Nuernberger, Lincoln, Neb., for plaintiff.

Kennedy, Holland, DeLacy & Svoboda, L. J. Tierney, Omaha, Neb., for defendants.

DONOHOE, Chief Judge.

Plaintiff, the Village of Walthill, a Nebraska corporation, instituted this action before a condemnation court appointed pursuant to Sections 19–701 to 19–707, R.R.S., Nebr.1943, to condemn a gas distribution system located in Walthill, Nebraska. The defendant, Iowa Electric Light and Power Company, an Iowa corporation, owner of the gas system removed the action to this court. Plaintiff's motion to remand on the ground that the cause, in its then posture, had not reached the maturity of a "civil action" within the meaning of Section 1441, Title 28 U.S.C. (1952 Ed.), was overruled. The nature of the proceedings before the board appointed pursuant to Sections 19–701 to 19–707, R.R.S.1943, is judicial, and not merely administrative, in character; consequently the cause had the dignity of a "civil action" within the meaning of the Federal Removal statute. See 2 Cyclopedia of Federal Procedure (3rd Ed.), sec. 3.16, p. 210. The case of Chicago, R. I. & P. R. Co. v. Stude, 346 U.S. 574,

74 S.Ct. 290, decided after this court's ruling upon the motion to remand does not require any change in the original ruling. This court has jurisdiction. 28 U.S.C.A. § 1441; 28 U.S.C.A. § 1332.

After careful consideration of the material and competent evidence adduced at the trial the court makes the following special

### Findings of Fact.

At a properly called special meeting of the chairman and board of Trustees of the Village of Walthill on March 5, 1953, in the office of the Village Clerk, a resolution was passed which in substance provided for the submission of the following question to the Walthill electorate:

"Shall the Village of Walthill, Thurston County, Nebraska, acquire and appropriate by exercise of the power of eminent domain, the gas plant hereinafter described, from Central States Electric Company, a corporation, and any other owner of said gas plant, by bringing the necessary condemnation proceedings before the proper court and by tendering therefore into such court the amount determined by such court, as the value and award made by such court, and by issuing, as necessary, bonds of the Village of Walthill, Nebraska, to provide the funds to make such tender?

"The gas plant to be acquired is generally described as follows: The gas plant of Iowa Electric Light and Power Company, a corporation, Central States Electric Company, and any other owners of the gas plant within the Village of Walthill, Nebraska, consisting of pressure regulating stations, gas mains, service connections, meters and other gas equipment, the franchise under which said company is now operating, its contract for the purchase of natural gas sold and used within the Village of Walthill, Nebraska, and all parts, tangible and intangible, of said gas plant used and useful in the distribution and sale of natural gas and the rendering of gas service within the Village of Walthill, Nebraska."

On March 26, 1953, and April 2, 1953, the Walthill Citizen, a legal newspaper circulated in the Village of Walthill, carried a notice advising the electorate that the foregoing question would be voted upon at the general election on April 7, 1953.

After the election the chairman and members of the Village Board, acting as a Board of Canvassers, canvassed said election and found that there were 419 votes cast on the question submitted; that 251 votes were "yes", i. e. in favor of acquiring the gas plant, and 168 were "no". The Board of Canvassers thereupon found that more than 59% of the votes cast were in favor of the question and that the question, as affirmatively answered, had been adopted.

This action was thereafter instituted by the Village of Walthill to effectuate the proposed acquisition of the gas system.

Gas is delivered in its natural state to the Village of Walthill by the Northern Natural Gas Company at the border line station located on the east edge of town. At this point a regulator reduces the pressure of the gas from 400 pounds per square inch to 40 pounds per square inch. This reduction is accomplished by facilities not the subject of this condemnation suit. From the border line station gas is carried through high pressure pipes owned by the defendant to two secondary regulating stations. The regulators in these stations reduce the pressure to approximately five pounds per square inch.

The first regulating station is a small concrete structure, almost wholly underground, located near Hoagland Street and Farrington Avenue. In addition to a pressure regulator this station houses a gas odorizer. Gas in its natural state has no odor. For safety in distribution it is necessary to add a recognizable

smell to the gas; and this is the function of the odorizer. The court finds the present value of this station, including all pressure regulating equipment and the odorizer, to be $686.18.

The second regulating station, constructed along the same lines as the first, is located at Farrington Avenue near Little Street. The court finds the present value of this station to be $531.31.

A recording pressure gauge located in a cafe near the corner of Main and Hayden Streets enables the company to determine the pressure in its mains. This gauge has a present value of $52.64.

The gas is distributed throughout the village by means of an underground network of gas mains of varying sizes and age. In the schedule below these mains are listed and valued:

Mains.

| Diameter | Length | Reproduction Costs | Depreciation | Present Value |
|---|---|---|---|---|
| 4″ | 851′ | $ 2,289.19 [1] | 52% | $ 1,098.81 |
| | 402′ | 1,081.30 [2] | 2% | 1,059.67 |
| 3″ | 4325′ | 8,606.75 [3] | 54% | 3,959.10 |
| 2″ | 12680′ | 16,403.60 [4] | 70% | 4,921.08 |
| | 1030′ | 1,308.10 [4] | 12% | 1,151.19 |
| | 2390′ | 3,035.30 [4] | 3% | 2,944.24 |
| 1¼′ | 797″ | 836.85 [5] | 60% | 134.74 |
| 1′ | 248 | 248.00 [6] | 47% | 131.50 |
| | 140 | 140.00 [6] | 33% | 93.80 |
| | 264 | 264.00 [6] | 31% | 182.16 |
| | 250 | 250.00 [6] | 29% | 177.50 |
| | 120 | 120.00 [6] | 26% | 88.80 |
| | 315 | 315.00 [6] | 19% | 255.15 |
| | 88 | 88.00 [6] | 5% | 83.60 |

Total Present Value $16,281.34

1. Materials: cost per foot $1.44
   Labor: cost per foot 1.25

   Total: cost per foot $2.69
   In determining the cost per foot the court has taken into consideration the cost of all necessary fittings and also the cost of a 57 foot, 6 inch casing 5 inches in diameter which was necessary in laying this 851 foot section of 4 inch gas pipe. Plaintiff's expert estimated the present cost of labor at slightly over 30 cents a running foot while defendant's expert estimated the cost at $2.16 a foot ($1,844.50 for 851 feet). The court is inclined to the view that the cost would be in the neighborhood of $1.25 a lineal foot.

2. Cost per foot given in footnote 1.

3. Materials: cost per foot $ .99
   Labor: cost per foot 1.00

   Total: cost per foot $1.99
   The plaintiff's expert estimated the cost of labor at $.287 per foot while the defendant's expert estimated it at $1.60 per foot.

4. Materials: cost per foot $ .47
   Labor: cost per foot .80

   Total: cost per foot $1.27
   Plaintiff's expert estimated the cost of labor at $.277 per foot as opposed to defendant's expert's estimate of $1.25 per foot.

5. Materials: cost per foot $ .30
   Labor: cost per foot .75

   Total: cost per foot $1.05
   Plaintiff's expert estimated the cost of labor at $.27 per foot; defendant's expert estimated the same labor cost at approximately $1.20 per foot.

6. The court finds the reproduction cost to be $1 per foot. Plaintiff's expert did not differentiate between the 1″ and 1¼″ pipe. He fixed the cost per foot of the 1¼″ at $.57; however, for 1′ service pipe he estimated the cost per foot at $.68. Defendant's expert estimated the cost at approximately $1.30 per foot.

The gas is transmitted from the primary mains described above to the consumer's residence or business establishment by means of "service lines". These lines consist of pipe varying in size from ¾ of an inch in diameter to 2 inches. The length of each service line also varies, of course, in direct proportion to the distance between the gas main and the gas outlet in the consumer's home or business establishment. The cost of installing service lines is somewhat higher than the cost of installing mains of the same diameter because the service lines usually run a shorter distance in a single direction and generally require more fittings. The defendant's service lines include 87 feet of ¾ inch pipe; 5,908 feet of 1 inch pipe; 3,905 feet of 1¼ inch pipe; 122 feet of 1½ inch pipe; and 100 feet of 2 inch pipe. The court finds the present value of these service lines, as installed, to be $5,020.80.

At each consumer outlet which is a part of the Walthill system, the defendant has installed a gas meter whose function it is to measure the amount of gas consumed by the particular customer. In all there are 265 of these meters. There are 24 No. 150 meters manufactured by the Emco Rockwell Manufacturing Co.; 66 No. 175 meters manufactured by the same company; 153 No. 5B meters manufactured by the Metric, American Meter Company; 9 No. 10B meters manufactured by the same company; 12 No. 20B meters manufactured by the same company; and 1 No. 80B meter manufactured by the same company. The court finds the present value of these meters, as installed, to be $6,080.

Since the pressure of the gas has to be reduced at the consumer outlet from approximately 5 pounds to approximately 5 ounces, there is a small pressure regulator preceding each meter. The court finds the present value of all of these pressure regulators installed to be $2,260.

In addition to the specific physical assets previously mentioned there are certain special construction items and miscellaneous tangible assets which the court finds to have a present value of $760.

The total present value of the physical assets of defendant's distribution system which plaintiff is attempting to take by the power of eminent domain is $31,672.27. This value does not include tools and work equipment, meters in stock, shop equipment, store equipment, transportation equipment, office furniture and equipment, office supplies and other tangible assets owned by the defendant and used by it in connection with gas distribution systems in Lyons, Homer, Thurston, Rosalie and Winnebago, Nebraska, as well as Walthill. None of these assets are physically connected to the system in Walthill. None of them are specially adapted to the Walthill system and all of such assets may be used in the other five distribution systems. None of these assets will be diminished in value by reason of the condemnation of the Walthill system. In this connection, it should be mentioned that most of these assets are located in Lyons, Nebraska.

In addition to the tangible physical property the plaintiff is attempting to take certain intangible assets. The franchise has a present value of $19, the organization costs a present value of $75, the intangible construction costs (engineering, taxes and interest during construction) a present value of $2,217.06,[7] and since the system is presently operating, a going concern present value of $2,217.06.[8] Consequently the total present value of the Walthill gas distribution system which the plaintiff desires to take by the power of eminent domain is $36,200.39.

---

7. Engineering: 5% of the physical assets (present value).
   Taxes and Interest: 2% of the physical assets (present value).

8. Going concern: 7% of the present value of the physical assets.

## Discussion.

The plaintiff is proceeding under Section 19–701, R.R.S., Nebr.1943, which provides:

"Whenever the qualified electors of any city of the primary class, first class or second class or village vote at any general or special election to acquire and appropriate by an exercise of the power of eminent domain any waterworks, waterworks system, gas plant, electric light plant, or electric light and power plant, or heating plant, or street railway, or street railway system, located or operating within or partly within and partly without such city or village if the main part of such works, plant or system be within any such city or village and even though a franchise for the construction and operating of any such works plant, or system may or may not have expired, then any such city or village shall possess and have the power and authority by an exercise of the power of eminent domain to appropriate and acquire, for the public use of any such city or village, any such works, plant or system".

Under this statute, as the court reads it, the Village of Walthill is given authority to acquire, by an exercise of the power of eminent domain, *any gas plant,* located within, or at least partially so, the village. Defendant contends that its gas distribution system is not a plant within the meaning of the statute; and the court is inclined to agree.

■ The power of eminent domain is conferred by statute in derogation of the common law, and the statutes conferring the power should be construed strictly in favor of the landowner. 29 C.J.S., Eminent Domain, § 22, p. 806. However, such statutes should not be misconstrued in order to defeat their manifest purpose.

The term "gas plant" is defined as "a gas works" and the term "gas works" is in turn defined as "a commercial establishment in which gas (usually illuminating gas) is manufactured." Funk and Wagnall's New Standard Dictionary of the English Language (1949 Ed.), p. 1011. The term "gas plant" in its technical, as well as its usual sense, connotes an establishment in which gas is manufactured or processed as distinguished from merely being distributed. That the Nebraska Legislature had this distinction in mind in 1941, when Section 19–701 was last considered, Nebraska Session Law 1941, c. 26, § 1, p. 122, seems clear from an examination of a related statute enacted by the very same legislature. Section 17–905, R.R.S., Nebr., 1943, provides:

"Supplemental to any existing law on the subject and in lieu of the issuance of general obligation bonds, or the levying of taxes upon property, as by law provided, any city of the second class or any village may construct, purchase or otherwise acquire * * * a gas plant, or a gas system, including a natural or bottled gas plant, gas distribution system or gas pipe lines, either within or without the corporate limits of the city or village * * * and pay the cost thereof by pledging and hypothecating the revenue and earnings of any * * * gas plant or gas system, including a natural or bottled gas plant, gas distribution system or gas pipe lines, owned or to be owned by the city or village. * * *" Nebraska Session Laws, 1941, c. 22, sec. 2, p. 114.

■ Both of the before quoted statutes were passed by the same Legislature. By the first, Section 19–701, villages were given the power to condemn "gas plants". By the second, Section 17–905, villages were given authority to finance the acquisition of "gas plants and gas systems, including natural and bottled gas plants, gas distribution systems and gas pipe lines," by hypothecating anticipated earnings. Construing these statutes in pari materia, it seems clear that the statute providing the method of financing the acquisition of these utilities was not intended to enlarge the available methods of acquiring them. It seems

equally clear that since the same legislature used only the term "gas plant" in the condemnation statute while it used the phrase "gas plant or gas system, including a natural or bottled gas plant, gas distribution system or gas pipe lines" in the financing statute, that it did not intend the first term to be as broad in scope as the second phrase. Consequently the court has reached the conclusion that Section 19–701 does not give the Village of Walthill authority to take, by eminent domain, the defendant's gas distribution system. Nor can the court find such authority in Section 17–905.

 Counsel for the Village calls the court's attention to Section 17–559, R.R. S., Nebr., 1943, passed by the 1951 Legislature which provides:

> "Second-class cities and villages shall have power * * * to take private property for public use for the purpose of erecting or establishing market houses, market places, parks, or for any other public purpose, and to exercise the power of eminent domain within or without the city or village limits for the purpose of establishing and operating power plants to supply such city or village with public utility service, * * *."

It is true that the words "for any other public purpose" appearing in the above statute are broad enough to encompass the purpose of distributing gas. However, these general terms are preceded by a specific enumeration of public purpose property, namely, market houses, market places and parks. Under the doctrine of ejusdem generis, the general term "any other public purpose" must be limited to those purposes of the same general nature or class as the ones enumerated, to wit, market houses, market places and parks. 82 C.J.S., Statutes, § 332b, p. 658. A gas distribution system would not seem to be of the same general nature as a market place or park.

It is interesting to note that the legislature, by the same statute quoted above, vested the villages with power to condemn for the purpose of "establishing or operating *power plants*" to supply the villages with public utility service. However, no express authority is given to condemn for the purpose of operating a distributing system only; and under the doctrine of *expressio unius est exclusio alterius*, no such authority should be implied. See 82 C.J.S., Statutes, § 333, p. 666.

For the reasons stated, the court has reached the conclusion that the Village of Walthill has no power to condemn the defendant's distribution system. Counsel for the defendant shall prepare and submit for approval the appropriate judgment to be entered herein.